FILED
2014 Sep-23  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| CHRISTINA WILLIAMS,<br>o.b.o. K.G.,<br><br>Claimant<br><br>v.<br><br>CAROLYN W. COLVIN,<br>as acting Commissioner of the Social<br>Security Administration,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE NO.: 4:13-CV-01257-KOB |

## MEMORANDUM OPINION

## I. INTRODUCTION

On July 2, 2010, the claimant's mother, Christina Williams, applied for supplemental

security income on behalf of the claimant, a child under the age of eighteen, under Title XVI of

the Social Security Act, alleging disability commencing on July 2, 2008.  The claimant alleged

severe depression with psychosis, severe auditory and visual hallucinations, borderline

intellectual functioning, and developmental reading disorder. (R. 109-112). The Commissioner

denied these claims initially on November 5, 2010. (R. 52).

The claimant timely filed a request for a hearing before an Administrative Law Judge on

January 7, 2011. (R. 16). The ALJ held the hearing on May 17, 2012. (R. 35). In an opinion dated

June 26, 2012, the ALJ found that the claimant was ineligible for supplemental security income

benefits. (R. 20-32). The Appeals Council subsequently denied the claimant's request for review

on May 6, 2013, and the ALJ's decision became the final decision of the Commissioner of the

Social Security Administration (R. 1-6). As the claimant has exhausted her administrative

remedies, this court has jurisdiction pursuant to 42 U.S.C. § 1383(c)(3).

For the following reasons, the court reverses and remands the decision of the

Commissioner because of the ALJ's failed to apply the proper legal standard regarding the

weight he must give treating physicians.

## II. ISSUES PRESENTED

Whether the ALJ committed a reversible error by failing to state with particularity the

weight he afforded to the medical opinions of the claimant's treating physician Dr. Khan.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm

the Commissioner's decision if he applied the correct legal standards and if substantial evidence

supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422

(11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The

court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

The court must remember that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports the ALJ's finding.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The Social Security Administration has established a three-step sequential evaluation process to determine if an individual under the age of 18 is disabled. 20 C.F.R. § 416.924(a). At step one, the ALJ must determine if the child is engaged in substantial gainful activity. If the child is not engaged in substantial gainful activity, the ALJ then determines whether the child suffers

from a severe impairment or combination of impairments that cause more than minimal functional limitations. *Id.* at § 416.924(a) and (c). If the child suffers from a severe impairment or combination of impairments that has lasted or is expected to continue for a continuous period of at least 12 months, then the ALJ must determine whether the child's impairments meet, medically equal, or functionally equal an impairment listed under Appendix I to Subpart P of Part 404. *Id.* at § 416.924(a).

The ALJ must state with particularity the weight given different medical opinions and the reasons therefor, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must give the testimony of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004). The Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, the ALJ commits no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was twelve years old at the time of the administrative hearing and was in the fifth grade. (R. 37). The claimant alleges disability beginning on July 2, 2008, because of severe depression with psychosis, severe auditory and visual hallucinations, borderline intellectual functioning, and developmental reading disorder. (R. 100).

4

*Mental Limitations*

In an undated Function Report, the claimant's mother reported that the claimant had the ability to see, hear, and talk. She further reported that the claimant's disability did not limit his physical abilities. His mother did note that the claimant does or can deliver telephone messages, talk with family and friends; read capital and small letters; read simple words; print some letters; print his name; spell most 3-4 letter words; understand money, know the days of the week and the months of the year; have friends his own age; make new friends; get along with her or other adults; get along with school teachers; use a zipper, button clothes, and choose clothes by himself; tie his shoelaces; take a bath or shower without assistance; brush his teeth; comb or brush his hair; eat by using a knife, fork, and spoon; help out around the house; obey commands most of the time; obey safety rules; get to school on time; keep busy on his own; finish things he starts; work on arts and crafts projects; complete homework; and complete chores most of the time. (R. 121-30).

The claimant's mother also stated that the claimant did not or could not do the following: repeat stories he had heard; tell jokes or riddles accurately; explain why he did something; use sentences with "because," "what if," or "should have been;" read and understand simple sentences; read and understand stories in a book or magazine; write in script; write a simple story with 6-7 sentences; add and subtract numbers over 10; tell time; play team sports; wash his hair by himself; pick up and put away toys; or accept criticism or correction. She specifically noted that when he is corrected, the claimant cries and refuses to talk for a while. (R. 121-30).

On September 25, 2007, Ms. A. Milam, a licensed professional counselor at JBS Mental

Health/Mental Retardation Authority, completed the claimant's intake assessment. She reported that Ashville Elementary held the claimant back in the first grade because of an inability to learn the material. Ms. Milam reported that the claimant heard voices, saw his dead grandmother, and saw and heard voices of a little boy who was not there. She also reported that the claimant sometimes struggled to feel joyful, and that the voices disturbed his sleep and caused concentration problems. Ms. Milam discussed that the claimant tended to follow the directions that the voices gave him. She concluded by providing goals for the claimant of attending evaluations and following recommendations, as well as increasing social skills and coping skills. (R. 232, 240-51).

Between October 23, 2007 and May 28, 2008, Ms. Milam visited the claimant 14 times. On each visit, she noted that the claimant complained of visual and auditory hallucinations of his grandmother and a young boy. On November 26, 2007, she completed a diagnosis and update on the claimant's progress, noting that the claimant continued to cooperate with Ms. Milam, to appear depressed, and to report hallucinations, as discussed below. (R. 225-92).

On November 7, 2007, the claimant visited Dr. Shakil Khan, a psychiatrist in the Children's Services Program at JBS Mental Health/Mental Retardation Authority. Dr. Khan reported that the claimant complained of auditory and visual hallucinations, including seeing his deceased grandmother and a young boy. Dr. Khan noted that the Conner's Report[1] from September 25, 2007 showed that the claimant exhibited extreme impulsivity, inattentiveness,

---

[1]The Record does not include the "Conner's Report" from September 25, 2007. The "Conner's Report" may mean a report filled out by an individual named "Conner" or to the Connor's Test used for diagnosing ADHD.  In any event, no such report exists in the record.

fidgeting, and frustration, as well as frequent crying. Dr. Khan stated that the claimant had problems in school that required him to repeat kindergarten. After a mental status exam, Dr. Khan reported that the claimant looked sad, depressed, and withdrawn, and that his thought processes and content positively demonstrated auditory and visual hallucinations. Dr. Khan prescribed Risperdal 0.25mg in the morning, Risperdal 0.50mg at bedtime, and one half tablet of Zoloft 25mg twice a day. (R. 228-29).

On December 13, 2007, Dr. Khan reported that, since the patient started therapy, his psychosis appeared better. The claimant did not complain of command hallucinations, but still reported seeing a boy and his deceased grandmother. Dr. Khan noted that he had no side effects from the medication. Dr. Khan changed the timing of his Risperdal doses to 0.5mg at 5:00 PM and 0.5mg at 8:00 PM, and increased his Zoloft to 25mg twice a day. Dr. Khan instructed the claimant to continue intensive psychotherapy. (R. 267-68).

On January 10, 2008, the claimant visited Dr. Khan for a follow-up appointment. Dr. Khan reported that the claimant had behaved well at school. Dr. Khan also reported that the claimant still experienced auditory and command hallucinations, but the intensity and frequency had lessened. Dr. Khan noted that his mother stated that once a week the claimant got anxious when the voices told him to hurt his mother, but that he had previously experienced these events on a daily basis. Dr. Khan adjusted his Risperdal to 0.5mg twice a day and 0.5mg at bed time, and maintained his Zoloft prescription. (R. 264-65).

On February 14, 2008, Dr. Khan noted that the claimant still complained of auditory and visual hallucinations. The claimant reported that the boy now told him to do bad things and tried

to push him in front of a truck. The claimant told Dr. Khan that the hallucinations worsened in the early morning and evening. He maintained the claimant's Zoloft prescription, and increased his Risperdal to 1mg, one half tablet in the morning and one-and-a-half tablets at bedtime. (R. 260).

On February 22, March 24, and May 28, 2008, Ms. Milam's noted that the claimant's command auditory and visual hallucinations had lessened in severity. (R. 258, 277).

On February 28, 2008, Ms. Milam completed a Program Treatment Plan Review. She noted that the claimant had only minimal progress in achieving his goals of attending evaluations with his mother and following Ms. Milam's recommendations, and increasing social skills and coping skills. She noted that while the claimant attends appointments and his depression has improved, his psychosis remained a problem. She also noted that the claimant continues to demonstrate grief issues over the loss of his grandmother. (R. 274).

On March 7, Ms. Milam noted that the claimant's teachers discussed with her the claimant's need to disrupt the class and make the other students laugh. (R. 288).

On March 10, 2008, Ms. Milam completed a diagnosis and update on the claimant's progress, noting that the claimant cooperated, appeared within normal limits regarding his mood, and experienced hallucinations. Ms. Milam did note in this report that the claimant did not pose a safety threat to himself or others so long as he remained supervised, and that the claimant had behavioral and academic problems in school. (R. 255).

On April 10, 2008, Dr. Khan reported that the claimant continued to tolerate the medication well, but that the claimant had limited improvements in his level of functioning and

the frequency of his hallucinations. The claimant told Dr. Khan that the boy had told him to drown and hurt himself, or that the "house is on fire." Dr. Khan noted that the claimant still appeared anxious, nervous, and somewhat withdrawn. While in school, Dr. Khan reported that the claimant still made inappropriate noises, and acted sassy, sensitive, disruptive, submissive, impulsive, childish, and immature. He noted that the claimant's thought content positively demonstrated auditory and visual hallucinations. Dr. Khan discontinued the use of Risperdal, and instead prescribed Invega 3mg. Dr. Khan also increased the claimant's dosage of Zoloft to 50mg, half a tablet in the morning and one tablet at bedtime. (R. 286).

On May 28, 2008, Ms. Milam completed another Program Treatment Plan Review. She noted that the claimant had made minimal progress towards his goal of attending evaluations with his mother and following Ms. Milam's recommendations, and moderate progress towards his goal of increasing social skills and coping skills. She specifically noted that the claimant attends appointments but continues to experience hallucinations, though they have lessened in severity. She also noted that the claimant had resolved most of the grief issues surrounding the death of his grandmother but continues to work on his emotional expressions. Ms. Milam added addressing issues of loss and coping with his house fire as a third goal the claimant could work towards. (R. 274).

On June 27, 2008, Dr. Steven D. Dobbs, a state agency psychologist, found that the claimant suffered from major depressive disorder with psychosis. Dr. Dobbs noted that the claimant's medical records indicate that he occasionally hears a boy's voice, but that the medical examination reports from the school, mother, and mental health clinic indicate that the claimant

suffers from only mild concentration problems. Dr. Dobbs further concluded that the claimant's mother's list of the claimant's activities of daily living failed to indicate any significant mentally-caused functional limitations. Dr. Dobbs concluded that the claimant's mental limitations qualified as not severe, and that he did not experience any limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, or caring for the claimant's self.  (R.293-98).

On February 24, 2010, Juli Jones, a psychometrist for the Gadsden City Schools, conducted a Reynolds Intellectual Assessment Scales (RIAS) test on the claimant. The results of the RIAS test indicated that the claimant earned a Composite Intellectual Index (CIX) of 92, indicating that he exceeded 30% of the individuals his own age; a Composite Memory Index (CMI) of 94, indicating that he exceeded 34% of the individuals his own age; a Nonverbal Intellectual Index (NIX) of 107 and a Verbal Intellectual Index (NIX) of 81, indicating that the claimant's nonverbal intelligence was more developed than his verbal linguistic skills. Ms. Jones concluded that the claimant scored in the "Average" range of intellectual functioning. (R. 303-05).

On February 25, 2010, Ms. Jones conducted a Woodcock-Johnson III Normative Update Test of Achievement. Ms. Jones found that the claimant's overall level of achievement fell far below that of his peers. She concluded that his fluency with academic tasks, his academic skills, and his ability to apply those skills fell in the very low range. Specifically, Ms Jones noted the claimant's low scores in broad mathematics; math calculation skills; math reasoning; brief mathematics; written expression; brief writing; broad reading; basic reading skills; reading

comprehension; brief reading; and broad written language. (R. 306).

On March 10, 2010, Rhonda Perry of Donehoo Elementary School completed a Notice and Eligibility Decision Regarding Special Education Services. Ms. Perry concluded that the claimant suffered from a specific learning disability that qualified him for special education services. (R. 308-09).

On July 13, 2010, the claimant's mother completed another Function Report. The only changes the claimant's mother made were that the claimant now had an inability to read simple words, spell most three to four letter words, understand money, take a bath or shower without help, brush his teeth, comb or brush his hair, get to school on time, keep busy on his own, finish things he starts, complete his homework, and complete his chores. The claimant's mother did report that he could write in script and add and subtract numbers over 10. She finally noted that the claimant is very shy because of his intellectual level and his inability to read. His mother reported that the claimant becomes embarrassed and refuses to attend group functions as a result. (R. 143-52).

On August 15, 2010, Kayla Noah, a friend of the claimant's family, completed a Function Report. She reported that the claimant did not have difficulties seeing or hearing; the claimant's speech could be understood most of the time by people who knew him well, but only some of the time by people who did not know the child well; he could talk with family and friends; print some letters; print his name; walk; run; throw a ball; ride a bide; jump rope; use roller skates or roller blades; swim; use scissors; has friends his own age, can make new friends; generally gets along with Ms. Noah or other adults; generally gets along with school teachers; uses zippers and

chooses clothes by himself; ties shoelaces; brushes teeth; eats by himself using a knife, fork, and spoon; hangs up clothes; helps around the house; obeys safety rules; keeps busy on his own; and works on arts and crafts projects. (R. 167-76).

Ms. Noah further noted that the claimant could not do the following: deliver telephone messages; repeat stories he had heard; tell jokes or riddles accurately; explain why he did something; or use sentences with "because," "what if," or "should have been;" read capital and lowercase letters of the alphabet; read simple words; read and understand simple sentences; read and understand stories in books or magazines; write in script; spell most 3-4 letter words; write a simple story with 6-7 sentences; know the days of the week and the months of the year; understand money; tell time; work video game controls; dress/undress dolls or action figures; play team sports with other children; button clothes by himself; take a bath or shower without help; comb or brush his hair; wash his hair by himself; pick up and put away his toys; do what he is told most of the time; get to school on time; accept criticism or correction; finish things he starts; complete homework; and complete chores most of the time. (R. 167-76).

On September 22, 2010, Dr. June Nichols, a psychologist at Gadsden Psychological Services, L.L.C. completed a Disability Determination Comprehensive Evaluation. Dr. Nichols noted that the claimant suffered from intellectual deficits, and that he had enrolled in Special Education that year while in the fourth grade. She also noted that the claimant had some school disciplinary problems, including talking aloud in class. Dr. Nichols found that the claimant reported atypical symptoms of psychosis, but that he likely exaggerated the extent of these symptoms, as no evidence supported his experiences. While conducting the Mental Status

Examination, Dr. Nicholas reported that the claimant spoke clearly and at an appropriate pace; was oriented as to person and place, but not to time or situation; had a clear stream of consciousness; had grossly intact recent and remote memory functions; and had normal thought processes. Dr. Nicholas also reported that she considered the claimant's judgment and insight as poor. (R. 314-16).

Dr. Nichols administered the Wechsler Intelligence Scale for Children - Fourth Edition (WISC-IV) to determine the claimant's intelligence. Dr. Nichols stated that the claimant did not appear to put forth effort during the testing procedure, but that he did appear to suffer from some intellectual deficits. The claimant scored a Verbal Comprehension Index Score of 63, a Perceptual Reasoning Index Score of 61, a Working Memory Index Score of 62, a Processing Speed Index Score of 75, and a Full Scale IQ of 57. Dr. Nichols reported that because the claimant appeared to function higher than the scores, she estimated his functioning to be in the Borderline range of intellectual ability. Dr. Nichols concluded by stating that the claimant will have difficulty relating to peers and authority figures alike because of his intellectual deficits, will be unable to handle his own funds or live independently, and will not improve his intellectual deficits over the next 12 months. (R. 314-16).

On October 13, 2010, Dr. Rober Estock, a state agency psychiatrist, completed a Childhood Disability Evaluation Form. He noted that the claimant suffered from Specific Learning Disabilities that did not constitute severe impairments. In his explanation, Dr. Estock referenced previous consulting examination notes that reported the claimant exaggerated his condition and did not put forth adequate effort for the WISC-IV testing. As a result, Dr. Estock

concluded that the claimant did not suffer from a disabling condition, and his allegation could be considered partially credible at best. (R. 318-23).

On March 6, 2012, Ms. Yvonne Cooper of the C.E.D. Mental Health Center completed a screening examination on the claimant for an April 19, 2012 admission date for mental health services. She reported that the claimant suffered from severe Major Depressive Disorder with psychotic features. Ms. Cooper noted that the claimant had regularly attended school, and that his school had not expelled him during the previous school year. (R. 332-34).

On April 18, 2012, Dr. David R. Wilson, a psychologist at Gadsden Psychological Services, L.L.C. performed a psychological evaluation at the request of the claimant's attorney. Dr. Wilson noted that the claimant's mother provided him with extensive background information, including school records, a teacher questionnaire from Ms. Aldridge, a consulting examination by Dr. Nichols, and medical records from JBS Mental Health for dates between September of 2007 to June of 2008. (R. 324-25).

Dr. Wilson reported that the claimant discussed a man who stands in front of the road outside of his school and tells him to do bad things, but that the claimant resists. The claimant told Dr. Wilson that the man he sees has a gray beard, a black shirt, black pants, and black shoes. Dr. Wilson noted that the claimant told him the man only comes around at school and during the day. Dr. Wilson also reported that the claimant's mother frequently finds the claimant talking out loud, and he tells his mother that it is the voice in his head. He noted that the claimant discussed how the man prevents him from working on his homework, and tells him to do bad things. While the claimant normally resists, Dr. Wilson did note one instance in which the claimant told him

14

that he could not resist the man's demands while interacting with his older brother. Dr. Wilson concluded that the claimant does have visual and auditory hallucinations. (R. 324-27).

Dr. Wilson reported that the claimant's insight and judgment were poor, and that the claimant discussed panic-related symptoms when running away from the man. After performing a Reading Comprehension Subtest from the Weschler Individual Achievement Test, Dr. Wilson stated that the claimant did very poorly, noting that the claimant essentially could not read at all. Dr. Wilson also stated that he believed the voices may have interfered with the claimant's performance of the test, noting that the claimant performed worse than when his elementary school had tested him. (R. 326-27).

Dr. Wilson concluded that the claimant was a depressed and disturbed child who experiences ongoing auditory and visual hallucinations. While Dr. Wilson noted that the hallucinations may be the claimant's imagination, he indicated that he thought the hallucinations were more because the claimant appeared truly disturbed by the perceptual experiences.  Dr. Wilson diagnosed the claimant with severe and recurrent Major Depressive Disorder with psychotic features. He also diagnosed the claimant with a Developmental Reading Disorder and assessed him a Global Assessment Functioning (GAF) score of 50. Dr. Wilson noted marked limitations in reading and comprehending written material and comprehending and doing math problems. He also noted that the claimant's hallucinations may have an impact on his ability to acquire and use information, attend and complete tasks, interact and relate with others, move about and manipulate objects, and care for himself. (R. 327).

On April 19, 2012, C.E.D. Mental Health admitted the claimant. In his new admission problem assessment, his therapist Ms. Africa Bell, who holds a Master in Social Work, reported that the claimant suffered from auditory and visual hallucinations of a boy at school and at home. Ms. Cooper also noted that the claimant reported voices demanding him to harm himself, others, and property, but that he has not followed through with these demands. Dr. Cooper reported that, while the claimant did not suffer from suicidal ideation, he did report voices commanding him to stab his mother while she bathed in the bathtub. She found the claimant to suffer from depression, psychosis, and grief issues. Ms. Cooper reported that the claimant had suffered from these hallucinations since the passing of his grandmother in 2005. She examined the claimant's previous mental health treatment history, and noted that the claimant had been off all medication for three years. Ms. Cooper recommended biweekly therapy sessions for three months and then monthly afterwards, as well as quarterly family therapy and patient management assessments. A medical doctor or licensed psychologist concurred with Ms. Cooper's diagnosis.[2] (R. 332-40).

Ms. Cooper also discussed the claimant's family and educational history. She noted that the claimant lived with his mother and his eighteen-year-old brother. Ms. Cooper reported that the claimant had completed fourth grade and four months of fifth grade with a special education IEP. (R. 336-37).

On April 23, 2012, Dr. Marino S. Tulao of C.E.D. Mental Health examined the claimant. He reported that the claimant suffered from depression and psychosis. He prescribed Zoloft 50mg and Risperdal 1mg. (R. 341).

_____

[2]The signature of the medical doctor or licensed psychologist concurring with Ms. Cooper is illegible.

16

*The ALJ Hearing*

On June 30, 2008, the Commissioner determined that the claimant was not disabled and denied the claimant's application for supplemental security income. (R. 55-58). The claimant timely filed a written request for a hearing, and the ALJ held a hearing on May 17, 2012. (R. 35).

During the hearing, the claimant testified that he was twelve years old and currently in the fifth grade at Adam Elementary School. The claimant stated that he receives special assistance in reading and math that began while he attended Ashville Elementary School. (R. 37).

The claimant then explained that he sees a boy who commands him to do certain things. The claimant testified that he began seeing the boy a long time ago. He discussed that the boy appears every day, but that he never knows when the boy will appear. The claimant stated that the boy tells him to do several things, including run out in front of cars, and that if the claimant fails to obey, the boy yells at him. For instance, the claimant explained how one day while working on his homework, the boy told the claimant to stop doing his work and play with the boy instead. When he refused, the claimant explained that the boy started to tell him to hurt himself, but that the claimant refused to do so. While the medication prescribed by his doctors have helped, the claimant testified that they have not eliminated his hallucinations of the boy. (R. 37-41).

The claimant's mother then testified that her son had told the ALJ the truth. She explained that the claimant suffered from hallucinations since 2007, possibly even before that. The claimant's mother stated that she took him to mental health clinics, including the JBS. The doctors at JBS prescribed the claimant with Zoloft 25mg, Risperdal, and Benadryl. She testified

17

that she had to discontinue treatment as a result of her house burning down and relocating to Gadsden. (R. 41-42).

The claimant's mother elaborated on a new treatment course that the claimant had recently begun at C.E.D. Mental Health. Now that she had transportation, she stated that she could take the claimant to his appointments at the mental health clinic. The claimant's mother explained that the claimant had restarted his treatment of Zoloft and Risperdal, but the medications had not reduced the incidence of the hallucinations. She also explained how the claimant describes the boy as wearing black pants and black clothes. (R. 41-43).

The claimant's mother discussed potential safety threats posed by the hallucinations. She noted one incident in which the claimant and his older brother had an altercation because the boy had told the claimant to harm his brother. She stated that he had jumped off a retaining wall and skinned various parts of his body because the boy had told him to do so. She also testified that the boy had commanded the claimant to get a knife and stab his mother while she was in the bathroom, but that he refused to harm his mother. (R. 45-46).

His mother testified that the claimant cannot read. She explained that he could recognize a stop sign, but not a merge sign or yield sign; could tell time if it was 2:00 or 3:00, but not 2:46; and could not count change. She also testified that the claimant struggles to complete tasks, even if she refocuses him, because he will complain that the boy tells him to do other things. For instance, the claimant's mother testified that he could not sit through a two hour movie. Even when the claimant can focus and work on his assignments, he cannot complete them because he cannot read the questions. His mother stated that the claimant's elementary school would likely

keep him enrolled in special education classes. (R. 43-46, 49-50).

When asked about his social skills, the claimant's mother stated that he occasionally interacts with other people. She explained that if the claimant went to a vacation Bible school, or something similar, he would interact with the other children. However, the claimant's mother noted that her son can only occasionally meet people without any problems because of his shy demeanor. She also discussed various distractions that her son causes during school, but that she never received any notes from the teachers. (R. 47).

*The ALJ's Decision*

On June 26, 2012, the ALJ issued an opinion finding that the claimant was not disabled under the Social Security Act. (R. 23). First, the ALJ determined that the claimant had not engaged in substantial gainful activity since July 2, 2008. Second, the ALJ found that the claimant suffered from the following medically determinable impairments: specific learning disability and a history of Major Depressive Disorder with psychosis. However, the ALJ concluded that the claimant's impairments caused no more than minimal limitations and, he, therefore, did not have a severe impairment or combination of impairments. (R. 26).

The ALJ explained that he considered all of the relevant evidence in the case record, including objective medical evidence; other relevant evidence from medical sources; information from other sources, such as teachers, family members, or friends; the claimant's statements; and any other relevant evidence in the record. After describing the requirements of the pain standard, the ALJ articulated the reasons why he discounted the subjective testimony of the claimant. (R. 26).

19

The ALJ first examined the testimony of the claimant and his mother. The ALJ noted that the claimant alleges that he needs help with reading and math at school and that he experiences auditory and visual command hallucinations. The ALJ then discussed the claimant's mother's testimony regarding the claimant's continued mental health treatment. The ALJ stated that the claimant's mother testified that the claimant hears voices; cannot read well, tell time, or count change; does not complete tasks; and interacts with others. Despite acting out in class, the ALJ noted that the claimant's mother had never received a note from any of his teachers. The ALJ also discussed his mother's statements that the hallucinations had commanded the claimant to harm himself or others. (R. 27).

The ALJ then examined the medical evidence, and concluded that the claimant's medically determinable impairments could produce the symptoms alleged by himself and his mother, but not to the extent alleged.  The ALJ then examined the medical examination by Dr. Wilson. The ALJ stated that Dr. Wilson noted a history of grief associated with the death of the claimant's grandmother, but that other medical sources from February of 2008 indicated that his hallucinations were not so severe. He also noted that Dr. Wilson's notes reported that most of the claimant's grief issues had been resolved by May 28, 2008, and that no medical records existed for inpatient mental health treatment or any other mental health treatment since 2008. In addition, the ALJ also stated that Dr. Wilson's opinion that the claimant had greater limitations and that he suffered from Major Depressive Disorder with psychotic features was not consistent with the greater weight of the evidence. (R. 27).

The ALJ articulated that the claimant's initial disability report and school records do not

20

support a depressive disorder or psychotic condition. Instead, the ALJ stated that these records reflect a learning disorder, if he suffers from any problem at all. However, the ALJ noted that the claimant's mother had never received any complaints from the school about her son or his interaction with others. (R. 27).

After discussing the claimant's evidence, the ALJ then examined the report from Dr. Nichols. The ALJ explained that he found Dr. Nichols' report more persuasive because her opinion that the claimant exaggerated his symptoms of psychosis referenced the claimant's mental health records, function reports, and school records. Because those records failed to substantiate a mental health problem other than learning difficulties, the ALJ concluded that the claimant's depressive disorder resulted in no more than minimal functional limitations. (R. 27-28).

Regarding the claimant's learning disorder, the ALJ similarly concluded that the record did not support a finding of a severe impairment. The ALJ discussed the claimant's school records as demonstrating some learning difficulties, but that the records also indicated that the claimant fell within the average range of intellectual functioning. He also noted that during the claimant's visit with Dr. Nichols, she reported that he failed to put forth effort during WISC-IV testing and that he functioned higher than intellectual testing revealed. He again reiterated that the greater weight of the evidence undermined Dr. Wilson's medical opinion that the claimant's hallucinations limited his ability to learn. The ALJ found that the record did not have sufficient evidence to support that the claimant's learning disorder imposed more than minimal functional limitations. (R. 28).

The ALJ then stated that he reviewed and considered all opinion evidence and discussed the weight afforded to each opinion. He afforded great weight to the state agency evaluations by Dr. Dobbs and Dr. Estock, as well as the opinion of Dr. Nichols. The ALJ afforded little weight to the opinion of Dr. Wilson because he believed that his opinion was not consistent with the greater weight of the evidence. The ALJ also afforded little weight to Dr. Wilson's opinion because the claimant underwent his examination in an effort to generate evidence for appeal. He concluded by stating that the greater weight of the evidence demonstrated that the claimant had an impairment or combination of impairments that caused no more than minimal functional limitations. As a result, the ALJ found that the claimant did not qualify for disability benefits.

## IV. DISCUSSION

The claimant alleges that the ALJ committed a reversible error when he failed to state with particularity the weight afforded to the medical opinions of the claimant's treating physician Dr. Khan. This court agrees.

The ALJ's failure to state with particularity the weight assigned to different medical opinions and the reasons for doing so constitutes reversible error. *Sharfarz*, 825 F.2d at 279; *see also MacGregor*, 786 F.2d at 1053. The Commissioner must accord the opinions of the treating physician with substantial or considerable weight, and unless recounting *good cause* to the contrary, the Commissioner cannot discount the treating physician's opinions. *Lamb v. Brown*, 847 F.2d 698, 703 (11th Cir. 1998). Good cause exists if the physician's opinion is not supported by evidence; the evidence supports a contrary finding; the physician's opinion is conclusory; or the physician's opinion is inconsistent with the doctor's own medical records. *Phillips v.*

*Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); 20 C.F.R. § 416.927. Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, the ALJ commits no reversible error. *Moore*, 405 F.3d at 1212.

The ALJ failed to articulate the weight afforded to the medical opinions of the claimant's treating physician Dr. Khan. Throughout the entirety of his opinion, the ALJ never mentioned, discussed, or examined the medical opinions of Dr. Khan, who diagnosed the claimant with Major Depressive Disorder with psychotic features. This failure to articulate the particular weight afforded to Dr. Khan's medical opinions constitutes a reversible error.

The ALJ must give the testimony of a treating physician substantial or considerable weight unless the ALJ articulates "good cause" to the contrary. First, the ALJ never articulated any reason for failing to discuss or evaluate the opinions of Dr. Khan. In Dr. Khan's clinical notes from November 7 and December 13, 2007 and from January 18, February 14, and April 10, 2008, he continuously noted the claimant's Major Depressive Disorder and psychosis. He noted that despite medication, the claimant still reported auditory and visual command hallucinations. Dr. Khan noted that, although the frequency and intensity of the claimant's hallucinations had decreased, he reported instances of the hallucinations demanding him to harm himself and others. During each visit, Dr. Khan noted that the claimant's thought process demonstrated that the claimant suffered from these hallucinations. (R. 228-29, 255, 260, 264-65, 267-68, 286).

Dr. Khan acted as the claimant's treating physician from November 2007 to April 2008. Despite this treatment, the ALJ never mentioned Dr. Khan's medical opinions or diagnoses at

any point during his opinion. Even if this court found that the omission of Dr. Khan's medical opinions from the ALJ's discussion amounted to the ALJ affording it little weight, the ALJ would have had to articulate specific reasons for not giving the treating physician's opinion great weight.  The ALJ did not articulate why he failed to discuss Dr. Khan's opinions or why he afforded those opinions little, if any, weight. Because the ALJ failed to state with particularity the weight afforded to the claimant's treating physician Dr. Khan, and he failed to articulate specific reasons for not affording his medical opinions substantial weight, the ALJ committed a reversible error.

*Other Concerns*

Upon reviewing the decision of the ALJ, this court is also concerned that substantial evidence does not support the ALJ's determination that the claimant did not have a severe impairment or combination of impairments. When examining the evidence in the record, this court notes that Drs. Khan and Wilson, as well as Ms. Milam, all concluded that the claimant suffers from Major Depressive Disorder with psychotic features. Each one noted that the claimant experienced command hallucinations demanding that he complete specific tasks or do harm to himself or others. Ms. Milam reported that the claimant's hallucinations interfered with his ability to concentrate. Dr. Khan reported that the claimant's thought process tested positive for auditory and visual command hallucinations despite medication, and that the claimant's school reported that he acted out. Dr. Wilson examined the claimant *and* considered the consulting opinion of Dr. Nichols, in addition to other medical and opinion evidence. Although the claimant may have imagined the voices, Dr. Wilson concluded that the claimant suffered

from ongoing visual and auditory hallucinations because he appeared truly disturbed by the perceptual experiences. In addition to the medical opinions, the claimant's mother and Ms. Noah reported that the claimant could not read, count change, interact well with his peers, concentrate, or complete tasks.

The ALJ primarily relied upon the medical opinion of Dr. Nichols. In her single consultation, Dr. Nichols never reviewed the claimant's medical records, but she reported that the claimant appeared to exaggerate his symptoms without articulating *why* she thought he exaggerated. She found that the hallucination appeared to be figments of his imagination rather than psychosis, but gave no basis for her conclusions.   Where his treating physican Dr. Khan found that these hallucinations were valid and on-going even with medication, and the ALJ did not even discuss Dr. Khan's opinions or findings, this court  is concerned that substantial evidence does not support the ALJ's determination that the claimant does not qualify for disability benefit.  The court urges the ALJ to reevaluate this evidence in his decision on remand.

In addition, the additional evidence submitted to the Appeals Council from Ms. Bell, the claimant's therapist, and Dr. Tulao, which the ALJ did not have before him at the time of his decision, demonstrates that the claimant continues to suffer from visual and auditory hallucinations. Ms. Bell reported that the claimant's hallucinations disrupted his sleeping habits and caused angry outbursts, and Dr. Tulao prescribed Zoloft and Risperdol for the claimant's Major Depressive Disorder with psychosis. This additional evidence demonstrates that the claimant continues to suffer from Major Depressive Disorder and continues to experience auditory and visual hallucinations *despite* resolving his grief issues in 2008.  As such, the ALJ

should consider this evidence on remand.

## VII. CONCLUSION

For the reasons as stated, this court concludes the ALJ committed a reversible error by failing to indicate the weight he gave to the claimant's treating physician. Thus, his decision is due to be REVERSED and REMANDED consistent with this opinion.

This court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 23rd day of September, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE